Filed 7/5/22 P. v. Cerda CA2/3
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

e 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B232572 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA041397) |
| v. | |
| PETER CERDA et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Hayden A. Zacky, Judge. Reversed in part with directions; affirmed in part.

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant Peter Cerda.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant Kyle Johnson.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Scott A. Taryle and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

In 2011, Peter Cerda and Kyle Johnson were convicted of one count of murder and 23 counts of attempted premeditated murder with gang and firearm enhancements. They have since been pursuing their appellate remedies. This matter, which remains on direct appeal, is on remand from our California Supreme Court, which has directed us to vacate a prior decision we had issued and to reconsider the cause in light of recently-enacted Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775). We do so, and we also consider Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), which was passed while this appeal was pending. In view of those new laws, we reverse Johnson's judgment and reverse in part Cerda's judgment with directions to the trial court to give the People the opportunity to retry them.

## BACKGROUND

I.     Prosecution evidence[1]

Two shootings occurred on the evening of February 8, 2008, the first at Katrina Place and the second at Morning Circle, both in Palmdale.

---

[1]     Our summary of the facts underlying the crimes is largely as stated in our vacated 2020 opinion.

A. *The Katrina Place shooting (counts 1–14)*

On February 8, 2008, 14-year-old Robert E.[2] was at his house on Katrina Place. He was with his mother, Luz E., his sisters, Mayra E. and Christina E., and his brothers, including 12-year-old Francisco E. They were throwing a party at the house.

Later in the evening, Robert E. heard gunshots while he was in the garage with Ricardo R., his sister's friend. Robert E. heard something hit an area immediately next to him. Upon hearing the gunshots, he ducked and crawled into the house. He heard about 10 shots rapidly fire. Ricardo R. heard about 15 shots. The garage door was closed at the time.

Francisco E. was sitting at a dining room table with other family members and friends, including Gerardo Salazar, Mayra E., Stephanie R., Adriana R., Denise F., and Liz S. Windows to the dining room were located between the front door of the house and the garage. The dining room was on the first floor. Francisco E. heard more than 10 gunshots fired.

Adriana R. was in the dining room, sitting next to Salazar. She heard about 18 shots ricocheting off the walls. When she heard the shots, she threw Stephanie R., who was 13- or 14-years-old, to the ground. A foreign object hit Adriana R.'s eye, causing her to bleed. Glass hit the back of Mayra E.'s neck. She was sitting to the left of Salazar.

---

[2]     To protect the victims' personal privacy interests, other than Gerardo Salazar who was killed, we refer to each by first name and last initial. (Cal. Rules of Court, rule 8.90(b)(4).)

After shots ceased, Francisco E. could see holes in the dining room wall and curtain. Salazar was on the floor, bleeding, and he died from a gunshot to the head.

Luz E. and her husband, Sergio H., were in a bedroom when she heard about 20 gunshots. Christina E. was in another bedroom with her boyfriend, Daniel D. Four-year-old Aliza V. and nine-month-old Denise R. were in the master bedroom. Each of these bedrooms was on the second floor.

When the shots were fired, Daniel D. looked out a window and saw muzzle flashes from a large pickup truck. The truck remained stationary when the shots were fired. Daniel D. saw the shooter in the back of the truck, leaning out and firing the gun.

After the shooting, Luz E. saw bullet holes in the front of the house. Ricardo R. saw a hole in the garage door. Robert E. saw a hole in a television, located in the back of the garage, and one in a refrigerator.

B. *The Morning Circle shooting (counts 15–24)*

About 30 minutes after the Katrina Place shooting, gunshots woke Vicente V., who was at his house on Morning Circle. Twelve persons lived there, including members of his immediate family and his brother's family.

Vicente V.'s house had two floors. On the night of the shooting, he and his wife, Maria, were in their bedroom located immediately on top of the garage conversion. Their 13- and 7-year-old sons, Gerardo and Esteban, slept in a bedroom above their parents' bedroom. Their older son, Vince V., Jr., was sleeping downstairs. Their 15-year-old daughter, Cassandra, was sleeping in the family room. Their 16-year-old daughter, Patricia, was sleeping in another bedroom. Vicente V.'s brother,

4

Victor, and his wife, Veronica, slept in the master bedroom with their two-year-old daughter, Naomi, and four-year-old son, Alexander. Vicente V.'s 11-year-old nephew, Victor, Jr., and 10-year-old niece, Veronica, were sleeping in a bedroom on the second floor, above the garage.

After the shooting, Vicente V. went outside and saw six damaged areas. Two holes were above his front door. Another hole was in a stone facade to the right of the front door. There were also holes above and through a large window above the front door. The side of the garage, near the front entry, sustained a hole or additional damage. There was also damage to a fence post. Bullets struck multiple areas of the interior, including a staircase leading to an upstairs bedroom and the master bedroom.

Vicente V. denied being a member of the Val Verde Park gang. But he stated that Vince V., Jr., was a member.

C. *Forensic evidence*

Robert Keil, a criminalist, examined the house on Katrina Place after the shooting. Keil discovered 16 bullet holes on the exterior of the house, including one on the garage, one on the front door frame, and several around and through the dining room window. One bullet penetrated the garage door and a television inside of the garage before striking the back wall of the garage. Other bullets penetrated the exterior of the house and struck other areas inside, including the interior back wall of the dining room, a kitchen cabinet, and the entry to the kitchen. One bullet had blood, human tissue, and bone residue on it. This bullet went through the dining room window, penetrated Salazar's head, and struck the corner of the room.

Other bullets penetrated the exterior on the second story of the house, including its exterior wall and tiled roof. One of these bullets first penetrated two interior walls in an upstairs bedroom and a sliding door, before striking another wall. Walls by the upstairs staircase and other bedrooms were also struck. Other shots penetrated a bedroom wall and struck a hallway wall. Keil also found a bullet fragment in the master bathroom, which traveled across the upstairs hallway and through the master bedroom.

Sixteen spent casings were located on the street outside the Katrina Place house. The casings were for 7.62 by 39-millimeter rounds. Typically, an AK-style rifle uses this size of ammunition. Keil explained that an AK-style rifle is a semiautomatic assault weapon commonly used by military forces. Projectiles from these rifles travel at up to four times the velocity of a handgun, such as those using nine-millimeter ammunition. They have the potential to penetrate substantial barriers, including car doors and exterior walls of residences, as well as multiple additional walls. By contrast, a nine-millimeter bullet would not have the power to penetrate an exterior wall.

Keil determined that by the way the casings were grouped together, 11 shots were fired from one area in front of the Katrina Place house, and five shots were fired from another area about 15 feet away. The two groupings of casings were not consistent with shooting all 16 shots in rapid succession. Ten bullet fragments were discovered in the house. Based on the caliber, rifling characteristics, and bullet type, these fragments were consistent with the casings found in the street.

Keil also examined four additional casings and four live rounds which were collected in front of the Morning Circle house.

6

They matched the casings from the Katrina Place shooting. The casings were all fired from the same rifle.

D. *Pedro A.'s statements*[3]

The prosecutor called Pedro A. as a witness. Pedro A. was a member of the Evil Klan gang and was incarcerated for a gang-related crime. Pedro A. believed that he would be in protective custody or get killed if he assisted the district attorney's office or the police, or otherwise acted as a snitch.

Before calling Pedro A. as a witness, the prosecutor and Los Angeles County Sheriff's Detective Donna Cheek spoke with him, although Pedro A. claimed at trial not to remember or denied making any statements to them. He also claimed not to remember or denied making any statements to Los Angeles County Sheriff's Detective Howard Cooper, who, along with Detective Cheek, investigated the Katrina Place and Morning Circle shootings.

Detective Cheek recounted the statements Pedro A. made before his testimony. During the conversation, she and the prosecutor reviewed Pedro A.'s 2008 statement to Detective Cooper. Detective Cooper's recorded 2008 interview with Pedro A. was played for the juries.[4]

---

[3] Personal privacy interests support not identifying Pedro A. by his full name. (Cal. Rules of Court, rule 8.90(b)(10).)

[4] Cerda and Johnson were jointly tried, but each had his own jury.

7

On February 8, 2008, Pedro A. was at a party at a house of a person named Jorge.[5] Pedro A. was with Cerda, Johnson, and their friend, Saul Trujillo.[6] Pedro A. left the party for a short time. When he returned, he learned that Cerda, Johnson, and Trujillo had gone to another party on Katrina Place. Cerda and Trujillo returned and told Pedro A. that 18th Street gang members had beaten up Johnson. When Johnson returned from the Katrina Place party, Pedro A. saw that his lip was bleeding, and he was upset. They made plans to retaliate against the persons who beat up Johnson. They left the party and Cerda obtained an AK-47 from his house. Pedro A. described the AK-47 as a long black rifle with a wooden stock and a "banana clip" magazine. Cerda, Johnson, and Trujillo got into a Ford F-150 driven by Jose Casillas.[7] Cerda was in the front passenger seat; Trujillo was behind Cerda; and Johnson was behind the driver. They went to the party where Johnson had been beaten up. Pedro A. did not join them. Several minutes later, Pedro A. heard gunshots.

A couple of days after the shooting, Johnson told Pedro A. that they drove to the Katrina Place house. They drove around the block once. Johnson was lying down in the truck bed with the

---

[5]     His name is spelled two ways in the record, "George" and "Jorge." We use Jorge.

[6]     Pedro A. referred to Cerda, Johnson, and Trujillo by their nicknames, which were Snaps, Casper, and Dreamer, respectively.

[7]     Casillas was charged and tried separately from Cerda and Johnson. Pedro A. referred to him by his nickname, Puppet.

rifle.  When they stopped in front of the house again, Johnson sat up and fired into the house.  Johnson also told Pedro A. that Cerda shot up a house belonging to someone named Tank from the Val Verde Park gang which was "beefing" with their gang.

E.  *Party at Jorge's house*

Fifteen-year-old Erika V. and her sister, Yasmine, attended the party at Jorge's house.  The Katrina Place house was about a block from Jorge's house.  At about 11:00 p.m. to 12:00 a.m., Casillas drove Erika V. and Yasmine home in a dark green pickup truck.  She knew Casillas as "Puppet."  At the party, Johnson was introduced to Erika V. as "Casper."  As Erika V. was going home, she saw Johnson coming from the direction of the Katrina Place house.  He was staggering as if drunk.

F.  *Cerda's jailhouse phone calls*

Cerda made two phone calls while in jail.  The first call was to his parents.  His mother stated, "They said they were gonna let you go today."  Cerda responded, "No, no, no.  I'm not[,] mom.  I'm gonna be here for a long time."  Cerda then told his father, "Listen to me[,] they're not gonna release me."  Cerda explained, "I'm gonna be in here because I was involved in a murder.  My friend shot someone and killed 'em.  And I shot at a house but I didn't kill nobody, but my friend shot and killed someone.  I shot a house but I didn't kill nobody."

In the second call, Cerda spoke to a female named Vanessa and her father, admitting that he was involved in a murder.

### G. *Johnson's police interview*

Detective Cooper, along with Los Angeles County Sheriff's Detective Mitch Robison, interviewed Johnson. The interview was recorded and played for Johnson's jury.

Johnson initially denied involvement in the shootings. Johnson explained that he was at a party and hit up a person and argued with him. Johnson was drunk. Cerda and Trujillo told him to calm down and that they would take care of it. Johnson claimed not to know what Cerda and Trujillo were going to do. Johnson left the party.

Detective Robison acknowledged that Johnson was scared but encouraged him to "man up." Detective Cooper asked Johnson if he meant to kill somebody or only scare them. Johnson stated that he intended only to fight. Johnson's friends told him, "We're going to bust a mission." Johnson responded that he was not going. Johnson continued to deny that he went with them.

The detectives informed Johnson that his "homeboy" told them that he "busted up" the other house. Johnson stated that Cerda obtained a gun and asked him if he wanted to go. Cerda explained to Johnson that he should go with them because he was joining the gang. Johnson admitted to accompanying them in a black Ford F-150. However, he stated that Cerda was in the bed of the truck and fired shots when they reached the house. He further stated that Cerda also shot at the other house.

When Johnson continued to deny shooting at the first house, the detectives repeated that Johnson's "homeboys" said he committed the shooting.

When Detective Robison explained the importance of telling the truth, Johnson finally admitted to firing the gun. Johnson

stated that he did not mean to do anything wrong because he was drunk. He admitted to shooting at the "18th Street" house and confirmed that Cerda shot at the "Val Verde" house. He further stated that he accompanied Cerda to get his gun, which he saw Cerda load. Johnson was instructed to start shooting when they stopped driving and that he would have to shoot because he was joining a gang. He admitted again to the shooting and confirmed that he fired approximately 15-to-16 times from the bed of the truck.

After Johnson shot at the first house, he switched places with Cerda, who went to the bed of the truck. Cerda then fired shots at the "Val Verde" house.

H. *Gang evidence*

Los Angeles County Sheriff's Detective Robert Gillis investigated gangs in the Antelope Valley. In Palmdale in 2008, the Locos Marijuanos gang, or LMS, consisted of 10 members. During that time, the primary activities of LMS included vandalism, vehicle theft, carrying firearms, and shooting. Detective Gillis opined that in 2008, Johnson and Cerda were LMS gang members, based on their prior admissions to membership and associations with other members. Detective Gillis also spoke to Casillas, who admitted his membership in the LMS gang.

In 2008, a rivalry existed between the LMS gang and a gang called Val Verde Park, or VVP. LMS was allied with another gang called Lancas. Vicente V. was a founding member of the Val Verde Park gang. His son, Vince V., Jr., was also a member. In 2008, Lancas members shot at Val Verde Park members around the corner from Vicente V.'s home.

11

The 18th Street gang is one of the largest Latino gangs in Southern California. There were 18th Street gang members in the Antelope Valley. However, Detective Gillis was not aware of any rivalries between the 18th Street gang and LMS.

Detective Gillis discussed multiple facets of gang culture, including initiation into and loyalty to the gang, and the importance of respect. Gang members were required to back up their fellow gang members. He also discussed the significance of retaliation when gang members beat up a rival. In the detective's experience, the beaten gang member would retaliate with greater violence. Failure to retaliate would negatively impact the reputations of the beaten gang member and his or her gang, making the gang appear weak and subjecting it to attacks by the rival gang.

When asked to answer a hypothetical question derived from evidence of the Katrina Place shooting, Detective Gillis opined that the crime was committed for the benefit of the gang whose members committed the shooting. The retaliatory shooting intimidated and created fear in the community. He explained the significance of using an AK-47 assault rifle. Its sole purpose was to kill and was capable of penetrating multiple walls. Because of the AK-47's high-powered capability, the shooting exceeded retaliations that would normally occur. It was retaliation "with an exclamation point on it."

When the prosecutor asked a hypothetical question mirroring the shooting of the Morning Circle house, Detective Gillis similarly opined that the crime benefited the gang. He stated the second shooting would intimidate the community. Persons in the community would hear that the perpetrators were willing to commit two shootings against two separate gangs. The

second shooting would also show that the gang members did not fear apprehension. Detective Gillis explained that they would have boldly committed the second shooting when law enforcement would be nearby investigating the first shooting, which had occurred only a short time before.

Detective Gillis stated that it was also common for multiple gang members to participate in drive-by shootings. Each gang member would assume a role, consisting of the driver, the shooter, and lookouts who would alert the others to the presence of law enforcement.

The detective also discussed the influence of the Mexican Mafia over Latino street gangs in Southern California. The Mexican Mafia prohibited gang members from shooting at children. It also required gang members to get out of their cars and walk up to their victims before shooting to avoid injuring innocent persons. Violating these rules could result in punishment by death from the shooter's own gang or a rival gang. However, gang members did not always follow these rules. Gillis also clarified that the trend has returned to drive-by shootings.

II.    Defense evidence

Johnson testified on his own behalf. He was 16 years old at the time of the shootings.

On the night of the incidents, Johnson went to two parties. Before arriving at the first party, Johnson used crystal methamphetamine. At the first party, he drank 10-to-15 beers and smoked marijuana. He went to the second party at Katrina Place with Pedro A. and Trujillo. Johnson drank one or two additional beers at the Katrina Place party, but he was already drunk.

At the Katrina Place party, Johnson asked several men, "Where you from?" Several persons surrounded Johnson, and he was punched several times and knocked to the ground. He fled the party and went home, where he stayed the rest of the night. He denied being present for any shooting.

Johnson denied telling Pedro A. that he had been in the bed of a truck. He did not know from whom Pedro A. heard this information.

Johnson claimed that after he was taken into custody, a detective named Robert Jones told him to "just let them know what they want to know" and he could go home.

Johnson next spoke with Detective Cooper and other detectives. He denied involvement in the shootings. He told Detective Cooper that two others were involved in the shooting. Johnson stated that Cerda got in the bed of the truck and shot at the house. He also stated that Cerda and Trujillo got in the bed of the truck. Johnson told different stories because he was confused. He ultimately admitted to shooting. Johnson recognized that the detectives did not believe him when he initially denied involvement. Accordingly, he believed that if he told the detectives what they wanted to hear, he could go home.

Johnson testified that he lied to Detective Cooper in three interviews about being in the truck when the shooting occurred. He also testified that he lied about telling Detective Cooper that he drank only two to four beers. Johnson recognized that telling the police that he shot up a house and killed somebody would affect his life.

Johnson admitted that he was previously a member of LMS from 2007 to when he was arrested in 2008. He went by the moniker Casper. He also acknowledged that Trujillo was an LMS

14

member named Dreamer. Johnson had known Cerda for about one year prior to the shootings. He testified that Cerda was not an LMS gang member. Johnson also disputed that LMS was in a rivalry with Val Verde Park.

Johnson confirmed that if a gang member gets beaten up by rival gang members, he should retaliate. If the beaten gang member fails to retaliate, his fellow gang members would beat him up. Failure to retaliate would bring shame to the gang. Johnson testified that although LMS was not in a war against 18th Street, his getting beaten up showed disrespect, so he was expected to do something about it.

III.   Rebuttal evidence

Both juries heard the recorded police interviews with Johnson.

IV.   Verdicts and sentences

Cerda was convicted of the first degree murder of Salazar (Pen. Code,[8] § 187, subd. (a); count 1). Johnson was convicted of the second degree murder of Salazar (§ 187, subd. (a); count 1). The juries convicted Cerda and Johnson of 13 counts of attempted premeditated murder for the Katrina Place incident (§§ 664, 187, subd. (a); counts 2–14) and 10 counts of attempted premeditated murder for the Morning Circle incident (§§ 664, 187, subd. (a);

_____

[8]   All further undesignated statutory references are to the Penal Code.

15

counts 15–24).  Gang enhancements were found true as to each count against Cerda and Johnson.  (§ 186.22, subd. (b)(1)(C).)[9]

For counts 1 through 14 regarding the Katrina Place incident, Cerda's jury found true principal gun use enhancements.  (§ 12022.53, subds. (b), (c), (d), (e)(1).)  But for counts 15 through 24 regarding the Morning Circle incident, Cerda's jury found true personal gun use enhancements. (§ 12022.53, subds. (b), (c).)

For counts 1 through 14 regarding the Katrina Place incident, Johnson's jury found not true personal gun use enhancements.  (§ 12022.53, subds. (b), (c), (d).)  For counts 15 through 24 regarding the Morning Circle incident, Johnson's jury found true principal gun use enhancements.  (§ 12022.53, subds. (b), (c), (e)(1).)

In 2011, the trial court sentenced Cerda on count 1 to 25 years to life, plus an additional 25 years to life for the firearm enhancement.  On counts 2 through 14, the court imposed consecutive life terms with minimum parole eligibility periods of seven years, plus an additional 25 years to life for the firearm enhancement.  The total sentence on counts 2 through 14 was 416 years to life.  On counts 15 through 24, the trial court increased each of the minimum parole eligibility terms to 15 years pursuant to the gang penalty provision, plus an additional 20 years for the firearm enhancement.  The trial court also

---

[9]     Because murder and attempted premeditated murder are "punishable in state prison for life," the gang penalty provision, under section 186.22, subdivision (b)(5), should have applied, instead of the gang enhancement under subdivision (b)(1)(C).  (*People v. Lopez* (2005) 34 Cal.4th 1002, 1006–1007.)

imposed the terms on counts 15 through 24 consecutively.[10]  The total term on counts 15 through 24 was 350 years to life.  Cerda's total sentence was 816 years to life.

The trial court sentenced Johnson to 15 years to life on count 1.  On counts 2 through 14, the court imposed consecutive life terms, increasing the minimum parole eligibility terms to 15 years, pursuant to the gang penalty provision.  The total term on counts 1 through 14 was 210 years to life.  On counts 15 through 24, the trial court sentenced Johnson to 200 years to life.[11]  For the firearm enhancements, the trial court imposed an additional 20 years each to counts 15 through 24.[12]  Johnson's total sentence was 410 years to life.

V.    Procedural history of the appeals

Cerda and Johnson appealed their judgments of conviction, raising numerous contentions.  Cerda contended:  the evidence

---

[10]    The court imposed and stayed the terms for the lesser firearm enhancements as to each count.  (§ 12022.53, subd. (f).)

[11]    On counts 15 through 24, the trial court also imposed and stayed the minimum parole eligibility term for the gang penalty provision.  (§ 12022.53, subd. (e)(2); *People v. Brookfield* (2009) 47 Cal.4th 583, 595; *People v. Gonzalez* (2010) 180 Cal.App.4th 1420, 1427.)  However, the trial court did not account for the minimum parole eligibility term for attempted premeditated murder, which is life with the possibility of parole after serving a term of at least seven years.  (§§ 664, subd. (d), 3046, subd. (a)(1).)

[12]    On counts 15 through 24, the trial court imposed the 20-year enhancements for discharge of a firearm and imposed and stayed the lesser firearm use enhancement.  (§ 12022.53, subd. (f).)

was insufficient to support his attempted murder convictions; the evidence was insufficient to support his conviction for premeditated murder; instruction on the natural and probable consequences doctrine was erroneous; instructing the jury with CALCRIM No. 400 violated his constitutional rights; the trial court violated his right to present a defense by failing to instruct that the jury could convict him of shooting at an inhabited dwelling; giving the kill zone instruction was prejudicial error; his counsel provided ineffective assistance by failing to object to inadmissible hearsay constituting the only evidence of his gang membership; sentencing error; and the trial court violated his constitutional rights when it ordered a probation report to be prepared after pronouncing judgment.

Johnson contended:  the evidence was insufficient to support the attempted murder convictions as an aider and abettor; the kill zone instructions were erroneous; the trial court erred in instructing the jury with CALCRIM Nos. 400 and 601; the trial court should have instructed on intoxication; and his sentence was cruel and unusual based on his age.

We affirmed Cerda's conviction but vacated Johnson's sentence and remanded for resentencing as to him. (*People v. Cerda* (July 18, 2013, B232572) [nonpub. opn.].)  But when *People v. Chiu* (2014) 59 Cal.4th 155[13] was decided, we recalled the remittitur, reinstated the appeal, and concluded that Cerda's conviction for Salazar's murder had to be reversed and remanded

---

[13]     *People v. Chiu, supra,* 59 Cal.4th at pages 158 to 159 held "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine.  Rather, his or her liability for that crime must be based on direct aiding and abetting principles."

for a possible retrial of the murder count because it was possible the conviction was premised on the natural and probable consequences theory. Alternatively, the People could accept a reduction of the first degree murder conviction to second degree. (*People v. Cerda* (Jan. 23, 2015, B232572) [nonpub. opn.].) We again vacated Johnson's sentence.

Defendants petitioned for review again, and the Supreme Court granted review in April 2015. While the appeal was pending, our Legislature enacted Senate Bill Nos. 620 (2017–2018 Reg. Sess.) and 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). In 2018, the Supreme Court transferred the case to us with direction to vacate our opinion and to reconsider the cause in light of those new laws and *People v. Canizales* (2019) 7 Cal.5th 591, which clarified the law on when the kill zone instruction may be given.

On remand, we reversed Cerda's murder conviction because the trial court improperly instructed the jury on the natural and probable consequences doctrine but otherwise affirmed the judgments of conviction. (*People v. Cerda* (Feb. 7, 2020, B232572 [nonpub. opn.].) We remanded for possible retrial of the murder conviction, for resentencing under Senate Bill No. 620, and for a *Franklin*[14] hearing as to Johnson.

Defendants petitioned for review again. Our California Supreme Court granted the petitions, deferring action pending its decision in *People v. Lopez* (S258175). While the matter was pending review, the Legislature enacted Senate Bill 775 (Stats. 2021, ch. 551), which expanded the remedies created by Senate Bill 1437 to attempted murder. In 2022, the Supreme Court

---

[14]    *People v. Franklin* (2016) 63 Cal.4th 261.

19

transferred the case to us with directions to vacate our decision and to reconsider the cause in light of Senate Bill 775. We now do so, and we also consider Assembly Bill 333.

## DISCUSSION

### I.    Senate Bills 1437 and 775

Cerda and Johnson contend that instruction on the natural and probable consequences as to the murder and attempted murder counts was prejudicial error, under Senate Bill 775. The People concede the error but not its prejudicial nature.

### A. *Senate Bills 1437 and 775*

Senate Bill 1437 limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder. (*People v. Lewis* (2021) 11 Cal.5th 952, 957, 959; *People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*).)  To achieve these goals, Senate Bill 1437 added section 189, subdivision (e) (limiting application of the felony-murder rule) and section 188, subdivision (a)(3) (stating that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime").  As amended, section 188 "bars a conviction for first or second degree murder under a natural and probable consequences theory." (*Gentile*, at p. 846.)  Senate Bill 1437 also added section 1170.95, which created a procedure whereby persons convicted of murder under a now-invalid felony-murder or natural and probable consequences theory may petition for vacation of their convictions and resentencing.

Senate Bill 775 changed Senate Bill 1437 in several respects.  Two are relevant here.  First, Senate Bill 775 added subdivision (g) to section 1170.95.  That subdivision provides, "A

person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437." (§ 1170.95, subd. (g).) Subdivision (g) supersedes *Gentile*'s holding that Senate Bill 1437's ameliorative provisions do not apply on direct appeal (see *Gentile, supra*, 10 Cal.5th at p. 839), and allows defendants to challenge the validity of their convictions under the amended law in this appeal. (See *People v. Hola* (2022) 77 Cal.App.5th 362, 369–370; *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 584.)

Second, Senate Bill 775 expanded Senate Bill 1437 to reach attempted murder. As originally enacted, section 1170.95's express language encompassed only murder, not attempted murder or manslaughter. (See, e.g., *People v. Flores* (2020) 44 Cal.App.5th 985, 993–994.) Senate Bill 775 amended section 1170.95 to expressly encompass attempted murder and manslaughter. (§ 1170.95, subd. (a); see also *id.*, subd. (d)(1); *People v. Porter* (2022) 73 Cal.App.5th 644, 651–652; *People v. Coley* (2022) 77 Cal.App.5th 539, 544.) Thus, Senate Bill 775 eliminates the natural and probable consequences doctrine as a basis to prove an accomplice committed attempted murder. (*People v. Sanchez* (2022) 75 Cal.App.5th 191, 196.)

There is no dispute that Cerda and Johnson's appeals were not final when Senate Bill 775 took effect, and therefore the amendments apply retroactively to them. (See, e.g., *People v. Montes* (2021) 71 Cal.App.5th 1001, 1006–1007; *People v. Porter, supra*, 73 Cal.App.5th at p. 652.) Because this matter remains on direct appeal, any remedy would be the possibility of retrial, rather than resentencing under section 1170.95. (See *People v. Hola, supra*, 77 Cal.App.5th at p. 373.)

21

B. *Harmless error analysis*

As to both the murder and attempted murder counts, Cerda's and Johnson's juries were instructed on the natural and probable consequences doctrine with shooting at an occupied house as the target offense and murder and attempted murder as the nontarget offenses, per CALCRIM No. 403. The jury was also instructed on aiding and abetting with CALCRIM Nos. 400 and 401. As our discussion of Senate Bills 1437 and 775 above makes clear, however, instruction on the natural and probable consequences doctrine was improper under the amended law, as the People concede. We therefore turn to the question of prejudice.

"When a trial court instructs the jury on alternative theories of guilt and at least one of those theories is legally erroneous at the time it was given, we normally assess whether the error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24." (*Gentile, supra*, 10 Cal.5th at p. 851; *People v. Aledamat* (2019) 8 Cal.5th 1, 3 (*Aledamat*).) We "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[ ] the error was harmless beyond a reasonable doubt." (*Aledamat*, at p. 3.)

In *Aledamat*, our Supreme Court "rejected a more demanding standard of review . . . that would have required the court to examine the verdict and the record and to find evidence in the record to support a determination, beyond a reasonable doubt, that the jury actually relied on the valid, not the invalid, theory." (*People v. Thompkins* (2020) 50 Cal.App.5th 365, 399; see *People v. Glukhoy, supra*, 77 Cal.App.5th at pp. 592–593;

22

*People v. Stringer* (2019) 41 Cal.App.5th 974, 984.) *Aledamat*, *supra*, 8 Cal.5th at page 9, concluded, "no higher standard of review applies to alternative-theory error than applies to other misdescriptions of the elements. The same beyond a reasonable doubt standard applies to all such misdescriptions, including alternative-theory error." "It is enough if we can say, beyond a reasonable doubt, the legally inadequate theory did not contribute to the verdict." (*Thompkins*, at p. 399.)

*Aledamat* suggested various nonexclusive methods of evaluating prejudice. "An examination of the actual verdict may be sufficient to demonstrate harmlessness, but it is not necessary." (*Aledamat*, *supra*, 8 Cal.5th at p. 13.) The reviewing court may examine "what the jury necessarily did find" and consider "whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well." (*Id.* at p. 15, citing *California v. Roy* (1996) 519 U.S. 2, 7 (conc. opn. of Scalia, J.).) Circumstances that may factor into the prejudice calculus include the parties' arguments, questions posed by the jury, and the instructions as a whole. (*Aledamat*, at pp. 12, 13–14; *People v. Baratang* (2020) 56 Cal.App.5th 252, 263.) Alternative-theory error is also harmless where, "based on evidence that is overwhelming and uncontroverted," the reviewing court is "convinced on appeal, beyond a reasonable doubt, that ' "the jury verdict would have been the same absent the error." ' " (*People v. Thompkins*, *supra*, 50 Cal.App.5th at p. 401, citing *People v. Merritt* (2017) 2 Cal.5th 819, 832.)[15]

---

[15]    There is some dispute about how the error analysis is to be applied under *Aledamat*. (See generally *People v. Glukhoy*, *supra*, 77 Cal.App.5th at pp. 596–599.) We need not weigh in on

C. *Cerda*

As we have said, a jury convicted Cerda of the first degree murder of Salazar and 23 counts of attempted premeditated murder, 13 of which arose from the Katrina Place shooting and 10 from the Morning Circle shooting. As to the Katrina Place shooting (counts 1–14), the jury found true principal gun use allegations as to Cerda. As to the Morning Circle shooting (counts 15–24), the jury found he personally used and discharged a firearm under section 12022.53, subdivisions (b) and (c).

1. The Morning Circle shooting

Beginning with the Morning Circle shooting, the People urge that the true findings on the personal use and discharge of a gun establish that Cerda was the shooter, meaning the direct perpetrator of the attempted murders. We agree. As such, the jury must have found that Cerda had the requisite intent to kill as to the Morning Circle counts, even considering the natural and probable consequences instruction. The natural and probable consequences instruction, CALCRIM No. 403, told the jury that before it decided whether "the defendant is guilty of murder or attempted murder based on a natural and probable consequences theory, you must decide whether he is guilty of shooting at an occupied house." Accordingly, the jury had to find: (1) the defendant was guilty of shooting at an occupied house; (2) during the commission of that shooting, the defendant or a coparticipant committed murder; and (3) under all the circumstances, a reasonable person in the defendant's position would have known

_____

the dispute, because the result is the same under any standard of harmless error beyond a reasonable doubt.

24

that the murder was a natural and probable consequence of shooting at an occupied house. The instruction further defined "coparticipant" and "natural and probable consequence."

By finding that Cerda was the Morning Circle shooter, the jury necessarily found that he also was the attempted murderer. That is, the jury did *not* find that anyone else shot at the house; rather, it found only principal gun use allegations true as to Johnson. And the evidence was that only one gun was used at Morning Circle, the AK-47. Therefore, the jury must have found (1) that Cerda shot at the Morning Circle house and (2) he committed attempted murder, the elements of which were otherwise defined in the instructions as requiring intent to kill. (CALCRIM Nos. 520, 600.)

Indeed, as to the Morning Circle counts, the prosecutor did not argue the natural and probable consequences doctrine. Instead, the prosecutor argued that Cerda "personally shot up" the house, "not as an aider and abettor, but as a strict principal."

Finally, evidence of Cerda's intent to kill was compelling. The AK-47 belonged to Cerda, and therefore, he more likely understood its capabilities. Those capabilities, as the criminalist testified and the evidence showed, included the ability to penetrate even exterior walls of a house. The criminalist further said that this weapon's purpose is to kill, and when a gang member uses it, it is retaliation with an exclamation point. Cerda also admitted in jailhouse calls to his parents that he shot up a house, even if he did not admit his intent in doing so. Further, there was evidence that Cerda was a gang member and, as such, had a motive to retaliate against rival gangs and to seek retribution for the earlier assault on Johnson. Given the jury's verdict that Cerda was the shooter, that the prosecutor did not

rely on the natural and probable consequences doctrine, and the evidence, the error in instructing the jury on that doctrine was harmless.

## 2. The Katrina Place shooting

Turning to the Katrina Place shooting, the verdicts are not as revelatory. Cerda's jury found him guilty of principal gun use allegations, while Johnson's jury rejected the People's theory that Johnson was the shooter. Although it could be said that these findings suggest Cerda was also the Katrina Place shooter, no jury was asked to make such a finding; accordingly, there is no finding that Cerda shot at Katrina Place. Therefore, unlike with the Morning Circle verdicts, the verdicts as to the Katrina Place shooting do not show that instructing on the natural and probable consequences doctrine was harmless.

Contributing to the potential prejudicial nature of the instructional error, the prosecutor in closing argued the natural and probable consequences theory specifically as to the Katrina Place shooting to the jury. He told the jury that if it did not think Cerda intended to kill anyone and that "they were just shooting into a home and somebody just happened to die," the jury, by finding that someone shot into the house, could still convict Cerda of murder. The prosecutor explained, "If you are involved in a crime where the natural and probable consequence is that somebody is going to die, then you get to convict them of the ultimate result. Of the murder itself." The prosecutor said that so long as the jury found somebody shot into an occupied home and somebody died, "even if you believe that Cerda didn't intend to aid and abet the murder of Salazar," Cerda was still guilty of Salazar's murder. "So even if you think look, I don't think Cerda had anything to do with killing these people. I think all he

26

wanted to do was hand the gun" to Johnson, knowing that Johnson was going to shoot that house up, the "law says [Cerda] is still guilty of murder." As an aider and abettor to shooting at an occupied house, a reasonable person in Cerda's position would know that murder was a natural and probable consequence of shooting at an occupied house. "Unless I have an I.Q. of two, I know lighting up a house with an assault rifle, somebody is going to die." Thus, the prosecutor urged the jury to find Cerda guilty under the natural and probable consequences doctrine, which weighs in favor of a prejudice finding. (See, e.g., *People v. Sanchez, supra*, 75 Cal.App.5th at p. 197 [prosecutor argued both theories to jury]; *People v. Baratang*, *supra*, 56 Cal.App.5th at p. 264 [prejudicial error found where prosecutor argued legally invalid theory at length]; *People v. Powell* (2021) 63 Cal.App.5th 689, 715 [prosecutor's argument is relevant to whether error harmless]; *In re Rayford* (2020) 50 Cal.App.5th 754, 783.)

Nor do the jury's premeditation findings as to the attempted murders establish it convicted Cerda based on his own mens rea. Although the jury found that the murders attempted were premeditated and willful (defined in the instructions as intending to kill when they acted), the jury was instructed that the premeditation did not have to be personal to each defendant. Instead, the jury was instructed that "Peter Cerda *or* Kyle Johnson" acted willfully if they intended to kill when they acted, deliberated if they carefully weighed their choice, and acted with premeditation if they decided to kill before acting. (CALCRIM No. 601, italics added.) "The attempted murder was done willfully and with deliberation and premeditation if either the defendant or Peter Cerda or all of them acted with that state of mind." (CALCRIM No. 601.) Therefore, the premeditation

27

instruction does not conclusively establish that the jury found Cerda intended to kill.

Finally, the People describe the evidence of Cerda's intent to kill as "overwhelming," primarily citing the firing of multiple rounds of high-velocity ammunition from an AK-47. As the criminalist testified, military forces use the AK-47, and its ammunition can penetrate substantial barriers, including exterior walls and multiple additional walls—which is exactly what happened here. As we have said, this evidence does speak to malice and intent to kill. Even so, we discern a difference between the scenario where Cerda *personally* used the gun to shoot at the Morning Circle house and one where he gave someone else the gun to shoot at the Katrina Place house. Given the totality of the record regarding the Katrina Place counts, including the verdicts, instructions, and the prosecutor's argument about the natural and probable consequences doctrine, we cannot say beyond a reasonable doubt that Cerda harbored the same intent as the actual shooter at Morning Circle and as the aider and abettor at Katrina Place. We therefore cannot find the error harmless.

D. *Johnson*

Johnson's jury convicted him of the second degree murder of Salazar and of the same 23 counts of attempted premeditated murder. However, as to the Katrina Place shooting, the jury did *not* find true personal gun use allegations under section 12022.53, subdivisions (b), (c), and (d), even though it was the People's theory of the case that Johnson was the shooter. As to the Morning Circle shooting, the jury found true *principal* gun use allegations under section 12022.53, subdivisions (b), (c), and (e)(1). Thus, unlike Cerda's verdict, Johnson's jury did not find

28

that Johnson personally used and discharged a firearm at either Morning Circle or Katrina Place. Accordingly, the verdicts do not preclude the conclusion that the jury relied on the now-invalid natural and probable consequences theory to find Johnson guilty of the crimes.

Nor do the jury's premeditation findings as to attempted murders establish it convicted Johnson based on his own mens rea. As we noted above, the jury was instructed that premeditation did not have to be personal to each defendant. That is, if the jury found that one defendant premeditated, it could impute that finding to the other coparticipant in the crimes. (CALCRIM No. 601.) Therefore, the premeditation instruction does not conclusively establish that the jury found Johnson intended to kill.

Moreover, the prosecutor argued the now-invalid natural and probable consequences theory in closing. The prosecutor began by discussing express and implied malice, premeditation, and aiding and abetting. He then turned to the natural and probable consequences doctrine, saying that if "some of you" did not think that Johnson went to the house to kill anyone, although he fired 16 rounds into the house, then he was still guilty of murder. "If somebody shoots into an occupied home and somebody dies, even though you say, look, I didn't mean to kill anyone, the law says you are still guilty of murder. . . . You don't get to simply say, I only meant to shoot up the front door so I unloaded 16 rounds into it. If somebody dies, tough." So, even if the jury believed that Johnson didn't intend to murder Salazar, Johnson "is still guilty of murder if you find that he committed the crime of shooting at an occupied house which led to the death of a person."

29

The prosecutor further explained that if Johnson were guilty of shooting at an occupied house, and during the shooting somebody died, and under the circumstances a reasonable person would have known that murder was a natural and probable consequence of shooting at an occupied house, then Johnson was guilty of murder. Thus, the prosecutor urged the jury to find Johnson guilty under the natural and probable consequences doctrine, which weighs in favor of a prejudice finding. (See, e.g., *People v. Sanchez, supra*, 75 Cal.App.5th at p. 197; *People v. Baratang, supra*, 56 Cal.App.5th at p. 264; *People v. Powell, supra*, 63 Cal.App.5th at p. 715; *In re Rayford, supra*, 50 Cal.App.5th at p. 783.)

The People, however, ignore the verdicts, instructions, and the argument and instead focus on the evidence, describing it as overwhelming that Johnson was the actual shooter at Katrina Place and the direct aider and abettor of the Morning Circle shooting. However, the jury *rejected* the People's theory that Johnson was the shooter at Katrina Place, suggesting it did not find the evidence overwhelming on that issue.

And although the evidence strongly supported an intent to kill, we cannot find—especially when considered in the total context of the verdicts, instructions, and argument—that it was overwhelming and uncontroverted. While there was evidence that the shooting or shootings were in retaliation for the beating Johnson had received earlier that night, the evidence does not necessarily establish what Johnson intended. To be sure, the nature of the weapon and ammunition used were compelling evidence of malice and intent to kill, but the evidence also was that the weapon belonged to Cerda, not to Johnson. Johnson therefore may not have understood the weapon's capacity.

30

Also, Johnson gave different statements about his participation in the crimes, maintaining at trial that he was not involved in them, that he had gone home that night and stayed there. However, before trial, he told Detective Robison that he shot at the "18th Street" house, but he did not mean to do anything wrong or to hurt anyone, and he was drunk. He also told a fellow gang member that he shot at the house, but Johnson did not elaborate specifically on his state of mind. Therefore, even if the jury believed that Johnson shot at a house— something that the verdicts do *not* reflect—it cannot be said beyond a reasonable doubt that the jury convicted Johnson based on a finding about his own mens rea as opposed to a coparticipant's.

We therefore cannot conclude that instructing Johnson's jury on the natural and probable consequences doctrine was harmless beyond a reasonable doubt.

II.    Assembly Bill 333 and the gang enhancements

Cerda and Johnson[16] argue that recent amendments to section 186.22, the gang enhancement statute, require reversal of the gang enhancements. The People concede, and we agree.

"Section 186.22 provides for enhanced punishment when a defendant is convicted of an enumerated felony committed 'for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.' " (*People v. Delgado* (2022) 74 Cal.App.5th 1067, 1085; *People v. Lopez* (2021) 73

---

[16]    Because we are reversing the substantive counts as to Johnson, most other issues, including the gang enhancement issue, are moot as to him.

Cal.App.5th 327, 344; § 186.22, subd. (b)(1).) One element necessary to prove a section 186.22, subdivision (b)(1) gang enhancement is that the group alleged to be a gang has engaged in a "pattern of criminal gang activity." (§ 186.22, subd. (f).) When the instant matter was tried, "pattern of criminal gang activity" was defined as the " 'commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more [enumerated] offenses, provided at least one of these offenses occurred after the effective date of [the enacting legislation] and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons . . . .' " (*People v. Valencia* (2021) 11 Cal.5th 818, 829; former § 186.22, subd. (e).) These prior offenses have come to be known as "predicate offenses." (*Valencia*, at p. 826.)

Assembly Bill 333, which took effect on January 1, 2022, made significant amendments to section 186.22. The legislation redefined "pattern of criminal gang activity" in five respects, as follows. (1) Previously, the predicate offenses had to have been committed, or convictions had to have occurred, within three years of each other. Now, additionally, the last offense must have occurred within three years of the date the current offense is alleged to have been committed. (§ 186.22, subd. (e)(1).) (2) The amended law expressly states that the predicate crimes must have been committed by "members," not simply "persons," as formerly stated. (*Ibid*.) In contrast to the former law, the predicates must have been gang-related. (*People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822–823.) (3) The amendments impose a new requirement that the predicate offenses "commonly benefited a criminal street gang, and the common benefit of the

offense is more than reputational." (§ 186.22, subd. (e)(1); *Rodriguez*, at pp. 822–823.) (4) Looting, felony vandalism, felony theft of an access card or account, and other identity fraud crimes no longer qualify as predicates, while other offenses (kidnapping, mayhem, torture, and felony extortion) now do so qualify. (§ 186.22, subd. (e)(1).) (5) The currently charged offense may not be used to establish the pattern of criminal gang activity. (*Id.* at subd. (e)(2).)

Assembly Bill 333 also modified the definition of "criminal street gang." Previously, section 186.22 stated that a criminal street gang was "any ongoing organization, association, or group" of three or more persons, whether formal or informal. That language has been changed to "an *ongoing, organized association* or group of three or more persons, whether formal or informal." (§ 186.22, subd. (f), italics added; see *People v. Delgado*, *supra*, 74 Cal.App.5th at p. 1086; *People v. Lopez*, *supra*, 73 Cal.App.5th at p. 344.) The previous definition required that the gang's "members *individually* or collectively engage in, or have engaged in," the pattern of criminal gang activity. (Former § 186.22, subd. (f), italics added). Now, the word "individually" has been excised and the gang's members must "collectively" engage in, or have engaged in, the pattern of criminal gang activity. (§ 186.22, subd. (f).) The amendment also added a new subdivision clarifying that benefit to the gang must be more than reputational; for example, "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or

33

intimidation or silencing of a potential current or previous witness or informant."  (§ 186.22, subd. (g).)[17]

Assembly Bill 333's amendments to section 186.22 apply retroactively to this case.  (See, e.g., *People v. Rodriguez, supra,* 75 Cal.App.5th at p. 819; *People v. E.H.* (2022) 75 Cal.App.5th 467, 478; *People v. Delgado, supra,* 74 Cal.App.5th at p. 1087; *People v. Lopez, supra,* 73 Cal.App.5th at pp. 343–344.)  As retroactively applied here, the prosecution provided evidence of two predicate offenses, vehicle theft and felony vandalism, but felony vandalism no longer qualifies as a predicate offense.  (§ 186.22, subd. (e)(1).)  Accordingly, the true findings on the gang enhancements must be reversed and the matter remanded to allow the prosecution the option of retrying the enhancements and establishing all elements required by Assembly Bill 333.[18]  (See, e.g., *E.H.,* at p. 480; *Delgado,* at p. 1091.)

III.    Sufficiency of the evidence

---

[17]    Assembly Bill 333 also enacted new section 1109.  That section provides, inter alia, that if requested by the defense, a charged section 186.22, subdivision (b) or (d) enhancement "shall be tried in separate phases," with the question of guilt of the underlying offense to be determined first and the truth of the gang enhancement tried thereafter.  (§ 1109, subd. (a).)  The People's concession regarding retroactivity does not extend to section 1109.  (See generally *People v. Perez* (2022) 78 Cal.App.5th 192, 207 [section 1109 is not retroactive]; but see *People v. Burgos* (2022) 77 Cal.App.5th 550, 564–568 [section 1109 is retroactive].)

[18]    Because we reverse the gang enhancements and remand for their potential retrial, we need not decide whether any other new elements of section 186.22 were met.

In their original appeals, Cerda and Johnson raised various contentions based on sufficiency of the evidence. Cerda contended there was insufficient evidence to support the premeditation finding as to the murder count. Johnson and Cerda both contended there was insufficient evidence they committed attempted murder (counts 2–24). Notwithstanding that we are reversing the judgment in its entirety as to Johnson and in part as to Cerda, we address these contentions, because if correct, then retrial would be barred. However, they are not, and, as we did in our original opinion, we reject the contentions.

A. *Standard of review*

To determine whether the evidence was sufficient to sustain a criminal conviction, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Baker* (2021) 10 Cal.5th 1044, 1103.) Reversal is unwarranted unless it appears " ' " 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " ' " the verdict. (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.) The same standard applies when the prosecution relies on

circumstantial evidence. (*People v. Vargas* (2020) 9 Cal.5th 793, 820.)[19]

B. *Sufficiency of the evidence to support the premeditation finding as to the murder count*

Murder is of the first degree when it is willful, deliberate and premeditated. (§ 189, subd. (a).) A killing is premeditated and deliberate if it is considered beforehand and occurred as the result of preexisting thought and reflection, rather than as the product of an unconsidered or rash impulse. (*People v. Pearson* (2013) 56 Cal.4th 393, 443.) "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. (*Ibid.*) However, it is unnecessary to prove the defendant maturely and meaningfully reflected upon the gravity of his act. (§ 189, subd. (d).) Premeditation and deliberation do not require any extended period of time. (*People v. Salazar* (2016) 63 Cal.4th 214, 245.) The issue is not so much the duration of time as it is the extent of reflection, because thoughts may follow each other with great rapidity, and cold, calculated judgment may be arrived at quickly. (*People v. Potts* (2019) 6 Cal.5th 1012, 1027.)

Three categories of evidence are especially probative to establish premeditation and deliberation: (1) what was the defendant doing before he committed the crime (planning activity), (2) facts about the relationship between the victim and

---

[19] Cerda's assertion that his conviction has no relevance to the standard of review is incorrect. Rather, we presume the judgment is correct, and the appellant, here Cerda, has the burden to demonstrate error. (See generally *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573 [appealing defendant bears burden of demonstrating insufficiency of evidence].)

the defendant (motive), and (3) the manner of killing.  (*People v. Potts*, *supra*, 6 Cal.5th at pp. 1027–1028; *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 (*Anderson*).)  These so-called *Anderson* factors are not all required, are not exclusive, and need not be accorded any particular weight; instead, they are a framework to guide appellate review.  (*People v. Morales* (2020) 10 Cal.5th 76, 89.)

Here, there was evidence of all three *Anderson* factors.  First, there was evidence of motive.  The defendants planned to attack the Katrina Place house in retaliation for the earlier assault on Johnson.  They then wanted to attack the Morning Circle house because rival gang members lived there.  As the gang expert therefore suggested, there was evidence the defendants were motivated to advance their gang's interests by instilling fear, intimidation, and respect in the community and in their rivals.  (See, e.g., *People v. Romero* (2008) 44 Cal.4th 386, 401 [motive shown where victim and defendant were members of rival gangs, and killing gang rival would elevate the killer's status]; *People v. Martinez* (2003) 113 Cal.App.4th 400, 413 [motive for shooting involved gang rivalry].)

Second, there was planning evidence.  The defendants discussed retaliating for the assault on Johnson, went to Cerda's house to get the AK-47, drove back to their friend's house to discuss the plan further, and then put the plan into action by driving to Katrina Place.  (See, e.g., *People v. Salazar*, *supra*, 63 Cal.4th at p. 245 [defendant brought loaded gun with him, "demonstrating preparation"]; *People v. Ramos* (2004) 121 Cal.App.4th 1194, 1208 [gang member armed himself before attending party, showing a "willingness to take immediate lethal action" if need arose]; *People v. Alcala* (1984) 36 Cal.3d 604, 626

37

[bringing and using deadly weapon raised reasonable inference defendant considered possibility of homicide at outset].) Contrary to Cerda's suggestion that Pedro A. only knew there was a plan to retaliate in some unspecified manner, Pedro A. told police that the defendants planned to "retaliate against the people" who had assaulted Johnson by shooting at that "fucker." Then, after shooting at the Katrina Place house, the defendants continued their mission by driving to Morning Circle and shooting at that house. (See, e.g., *People v. Mayfield* (1997) 14 Cal.4th 668, 767 [premeditation doesn't require extended period of time; cold, calculated judgment can be arrived at quickly], overruled on other grounds by *People v. Scott* (2015) 61 Cal.4th 363.)

Finally, the manner of the attempted killings—firing an AK-47 multiple times at the houses—tended to show premeditation and deliberation, as well as an intent to kill. (See, e.g., *People v. Herrera* (1999) 70 Cal.App.4th 1456, 1463–1464 [dozen shots fired during drive-by shooting evidenced premeditation], disapproved on another ground by *People v. Mesa* (2012) 54 Cal.4th 191, 199; *People v. Bolin* (1998) 18 Cal.4th 297, 332 [firing multiple gunshots at victims supported premeditation finding].) Here, a military assault rifle so powerful its bullets could penetrate walls was used, showing the potential lethality of the conduct.

In sum, the evidence was sufficient to support the premeditation finding.

C. *Sufficiency of the evidence to support attempted murder counts*

Johnson and Cerda contend that there was insufficient evidence they committed attempted murder as an aider and

abettor.  Cerda adds that there was insufficient evidence he directly perpetrated the attempted murders at Morning Circle. We disagree.

Attempted murder "requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.)  A person aids and abets a crime, including attempted murder, when the person, acting with (1) knowledge of the perpetrator's unlawful purpose; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense; (3) by act or advice aids, promotes, encourages, or instigates, commission of the crime. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.)  Factors relevant to aiding and abetting are presence at the scene of the crime, companionship, and conduct before and after the offense.  (*Ibid.*)

Here, the verdicts suggested that Johnson could have been convicted of all attempted murder counts 2 through 24 as an aider and abettor, and Cerda of the attempted murder counts 2 through 14 (Katrina Place) as an aider and abettor.  There was sufficient evidence of intent to kill, and that Cerda and Johnson aided and abetted these crimes.

Johnson and Cerda were together before, during, and after the shootings.  According to Pedro A., the defendants went to a party at Katrina Place where Johnson was assaulted.  Cerda and Johnson returned from that party and planned to retaliate against Johnson's assaulters, so they went to Cerda's home to retrieve the AK-47, a weapon with extremely deadly capabilities. With others, Cerda and Johnson traveled together in a truck to Katrina Place.  Cerda loaded the gun.  And although the jury found not true the allegation that Johnson shot at the Katrina

39

Place house, the evidence nonetheless was that Johnson was the shooter and Cerda was there, with him. After shooting up the Katrina Place house, Johnson and Cerda drove to the Morning Circle house, where Cerda now became the shooter. Johnson, having seen what had just happened at Katrina Place, could have had little doubt about what would happen at Morning Circle. Johnson also admitted knowing that they were going on a mission and feeling like he had to do it since he was in the gang. Cerda similarly admitted in his jailhouse calls that he and a friend shot up houses.

Defendants, however, suggest that this evidence at most shows they shot at an occupied house, a general intent crime under section 246. A jury, however, could find it shows much more: an intent to kill.[20] (See, e.g., *People v. Smith* (2005) 37 Cal.4th 733, 741 [firing toward victim at close range in way that could have inflicted mortal wound may support inference of intent to kill].) The evidence was therefore sufficient to show that defendants, either as aiders and abettors or as the direct perpetrator (Cerda) committed attempted murder such that retrial is not barred.

IV.   Instruction on the kill zone theory

The trial court instructed the jury on the kill zone theory as to the attempted murder counts, and Cerda contends that the theory was inapplicable. We disagree.

---

[20]   Cerda and Johnson argued that they could not have intended to kill people they could not see. We discuss this argument in connection with the kill zone theory.

As we have said, attempted murder requires a specific intent to kill and a direct but ineffectual act toward accomplishing the intended killing. (*People v. Lee*, *supra*, 31 Cal.4th at p. 623.) When a defendant attempts to kill two or more persons by a single act, the element of intent to kill must be examined independently as to each alleged victim. (*People v. Bland* (2002) 28 Cal.4th 313, 327–328 (*Bland*).) Intent to kill cannot transfer from one attempted murder victim to another. (*Id*. at pp. 328–329.)

Although intent to kill cannot transfer among victims, there may be a concurrent intent to kill that establishes attempted murder against each person a defendant tries to kill by his or her single act. (*Bland*, *supra*, 28 Cal.4th at p. 329.) Concurrent intent would be established when the defendant, while targeting a specific person, tried to kill everyone in the area in which that person was located to ensure the targeted person's death. In doing so, the defendant would specifically intend to kill everyone in that area. (*Ibid*.) This area around the primary target victim is the "kill zone." (*Id*. at p. 330.) This kill zone theory allows for a conviction of attempted murder against any victim who was in the specified area but was not the defendant's primary target. (*Id*. at pp. 329–330; *People v. Smith*, *supra*, 37 Cal.4th at pp. 745–746.)

*People v. Canizales*, *supra*, 7 Cal.5th at page 607, clarified under what circumstances the kill zone theory applies. The kill zone theory may only be applied when: "(1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant

41

intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target" was in that zone of harm. (*Ibid*.) *Canizales*, at page 607, elaborated that in determining the intent to create a kill zone and the scope of the kill zone, the circumstances of the attack include "the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target."

A. *Circumstances of the attack*

For both the Katrina Place and Morning Circle incidents, the shooters used an AK-47 assault rifle. Criminalist Keil explained that the high-caliber ammunition from such an assault rifle travels at up to four times the velocity of handgun ammunition and has the potential to penetrate substantial barriers.

The 16 shots fired from the assault rifle decimated the Katrina Place house.[21] All 16 shots penetrated the exterior walls. Many also penetrated internal walls and fixtures. The shots killed one person, and debris injured two others. The location of the casings in the street indicated that the truck stopped in front

---

[21] Cerda suggests that using an AK-47 assault rifle would only signify an intent to kill if the shooter had prior knowledge of the gun's capabilities. Even if we agreed, there was evidence of such prior knowledge. The evidence showed that the rifle belonged to Cerda, who would have witnessed multiple shots fired from the AK-47. After one shot was fired, Cerda and the others could have sufficiently appreciated the assault rifle's capabilities.

of the house, allowing the shooter to fire from close range. The two groups of casings further suggested to Keil that the shooter fired 11 shots from a stationary position, then turned or moved to another location and fired the remaining five shots. This deliberate positioning of the shooter and placement of shots could further support a finding he targeted specific locations of the house where victims were present.

Only 30 minutes after Katrina Place, Cerda shot at the Morning Circle house. The group employed the same tactics as those at Katrina Place. The truck pulled up in front of the house. Cerda fired shots from a stationary position in the bed of the truck, while Johnson and the others remained in the passenger compartment. Cerda fired close to the front of the house, as the location of the four spent casings and four live rounds indicated.

Significantly, Cerda fired the same high-velocity ammunition from the same military-style assault rifle, which had been fired only 30 minutes before. (Cf. *Canizales*, *supra*, 7 Cal.5th at p. 611 [shooter fired lower-powered nine-millimeter rounds from handgun].) Multiple shots again penetrated the exterior. One entered the master bedroom where Vicente V. and his wife were sleeping. Another struck a staircase leading to another bedroom. Other bullets were embedded in the exterior walls. The six damaged areas of the house suggested Cerda fired at least six shots, although only four spent casings were discovered. Notably, there were nine victims in the Morning Circle house, five fewer than in the Katrina Place house. Although Cerda fired fewer shots and did not injure anyone, the intent to create a kill zone "does not turn on the effectiveness or ineffectiveness of [his] chosen method of attack." (*Id*. at p. 611.)

43

The number of shots is relevant to intent to create a kill zone, but it is not dispositive. (*Ibid*.)

The location of the shootings also supports the kill zone theory. Unlike the open street where the shooting in *Canizales* occurred, the shooters here fired at two houses whose occupants conceivably had fewer places to run or to take cover, especially because of the wall-piercing ammunition used. Moreover, the shootings occurred at night, when it would be more certain that people would be in the houses.

The facts of both shootings stand in stark contrast to those in *Canizales*. The shooter in *Canizales* fired shots at his primary target from 100-to 160-feet away. The shooting occurred at a block party on a wide city street, open and unconfined by any structure. (*Canizales*, *supra*, 7 Cal.5th at p. 611.) Bullets were " 'going everywhere,' " rather than targeting specific victims. (*Ibid*.) Moreover, the *Canizales* shooter fired lower-powered nine-millimeter rounds from a handgun.

Cerda asserts that an intent to intimidate, as an alternative to an intent to kill, could reasonably be inferred from the circumstances of the attacks,[22] highlighting Detective Gillis's testimony that a gang member could commit a shooting with the intent to intimidate without also intending to kill. However, he was commenting on a hypothetical situation where a gang member fired shots into an *unoccupied* car, rather than an

---

[22] Cerda also contends that the prosecutor "conceded the existence of multiple inferences." The prosecutor did no such thing. Moreover, the prosecutor's argument is not relevant to whether instructing on the kill zone theory was proper, although it would be relevant to any analysis of prejudice. (*Canizales*, *supra,* 7 Cal.5th at pp. 613–614.)

occupied house. He qualified, "In gang life, it can't be painted so broad. Each case is different." In the situation of an unoccupied car, the shooter could have no intent to kill because there would be no victim to kill. Detective Gillis's testimony does not suggest that alternative reasonable inferences, including an intent to intimidate, could be drawn from circumstances of the attacks in this case. Instead, Detective Gillis testified that the sole purpose for using an AK-47 was to kill.

Intent to kill was also supported by Cerda's and Johnson's statements, as recounted by Pedro A. Cerda stated, "We're going to get them fools, you know. A gun and some other foolio." Johnson demanded, "[T]onight. Fuck that." This exchange could represent Cerda's proposal to kill the 18th Street gang members who beat up Johnson. The only reasonable inference to be drawn from the use of the assault rifle was the intent to kill everyone occupying the house.

Further, Cerda argues that no primary target existed in each shooting, rendering the kill zone theory inapplicable. We disagree.

*Canizales*, *supra*, 7 Cal.5th at page 608, required a primary target for the application of the kill zone theory. The kill zone theory addresses whether a defendant who murders or attempts to murder an intended target can be convicted of attempted murder of nontargeted persons. (*Ibid.*; *People v. Stone* (2009) 46 Cal.4th 131, 138.) When the defendant has the intent to kill a particular target, for attempted murder liability under the kill zone theory, the jurors must infer his or her concurrent intent to kill the nontargeted persons. (*Canizales*, at p. 608.) Intent to kill others could not be concurrent to an intent to kill a primary target if there was no primary target.

45

Vicente V. was the primary target at the Morning Circle house.[23] According to Detective Gillis, Vicente V. was a founding member of the Val Verde Park gang, with which his family had been associated for two generations. Vicente V., as well as Detective Gillis, identified Vince, Jr., as a Val Verde Park gang member. Vince, Jr., was also at the house during the shooting. Cerda and Johnson were affiliated with LMS, which was the rival gang of Val Verde Park.

Upon considering the circumstances of the attack at Morning Circle, including the power of the assault rifle used, the number and placement of shots, and the position and close range from which the shootings occurred, we conclude the evidence supported Cerda's intent to create a kill zone.

B. *Scope of the zone*

The second prong of the *Canizales* test evaluates the scope of the kill zone. Specifically, we must determine whether the nonprimary target victims were in the kill zone. (*Canizales*, *supra*, 7 Cal.5th at p. 607.) An area where the victims were subjected to mere risk of lethal harm is insufficient. It must be an area in which the shooter intended to kill everyone. (*Ibid*.)

Again, the circumstances of the attack inform our determination.[24] The scope of each kill zone encompassed the

_____

[23] Although what happened at Katrina Place is relevant to our analysis, only the counts concerning Morning Circle remain at issue.
[24] Because the Supreme Court in *Canizales*, *supra*, 7 Cal.5th at page 611, concluded that the evidence was insufficient to support a finding that the defendants intended to create a kill zone, it did not determine the scope of the zone.

entire house.  We base this conclusion on the use of the high-powered assault rifle, the damage to the interiors of the houses by the penetration of bullets through the exterior walls, the close range from which the shooter fired, and the number and placement of shots.  During the brief duration of each shooting, the victims were confined to the house.  Accordingly, each victim was located within the respective kill zone.

Cerda argues that the kill zone theory could not properly apply because the evidence did not reveal whether he knew where each victim was located.  Cerda further contends that *People v. Adams* (2008) 169 Cal.App.4th 1009, and *People v. Vang* (2001) 87 Cal.App.4th 554 (*Vang*), should not be cited for the proposition that a shooter may attempt to kill persons even though he or she is unaware of their presence.

We disagree.  *Vang* was cited with approval in *Bland*, *supra*, 28 Cal.4th at page 330, *Stone*, *supra*, 46 Cal.4th at page 140, and *Canizales*, *supra*, 7 Cal.5th at page 610.  *Vang* concluded that despite each shooter's inability to see all victims in the two targeted houses, the jury could reasonably infer the intent to kill every person in each house, based on the placement of shots, the number of shots, and the use of high-powered, wall-piercing firearms.[25]  (*Vang*, *supra*, 87 Cal.App.4th at p. 564.)

---

[25]    Cerda argues that the primary targets were not visible to the shooters, as they were in *Vang*.  This distinction is of little consequence.  As we have discussed, the physical presence of a primary target is not essential.  All that is required is that the shooters intended to kill someone.  Moreover, at issue in *Vang* was the sufficiency of evidence to support the attempted murders of the nine nonvisible victims.

"Whether or not the defendant is aware that the attempted murder victims were within the zone of harm is not a defense, as long as the victims were actually within the zone of harm." (*People v. Adams*, *supra*, 169 Cal.App.4th at p. 1023; accord, *Canizales*, *supra*, 7 Cal.5th at p. 607.)

The visibility of the victims and the shooter's awareness of their locations are relevant but not dispositive, as they might be in cases where the shooter fires a single shot from a handgun. (See *People v. Smith*, *supra*, 37 Cal.4th at pp. 747–748.) The attacks here were of such a magnitude that knowledge of the victims' specific locations was not necessary. The intent was to kill everyone in each house. Because each attempted murder victim was located inside the Morning Circle house, he or she was within the kill zone. Thus, substantial evidence supported the second prong, as well as the first prong, of the *Canizales* test. Accordingly, we conclude the jury was properly instructed on the kill zone theory.

V.     CALCRIM No. 400

Cerda contends that instructing the jury with a superseded version of CALCRIM No. 400 was prejudicial error. We disagree.

As given, CALCRIM No. 400 told the jury that a "person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is *equally guilty* of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed

it."[26] (Italics added.) Cerda takes issue with the "equally guilty" language, claiming it improperly tethered his culpability for attempted premeditated murder and premeditated murder to another's mental state.

Our California Supreme Court, however, has held that the "equally guilty" language generally is a correct statement of law. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433 (*Bryant*).) A perpetrator and an aider and abettor are equally guilty in that they are both criminally liable. (*Ibid.*)

Even so, the "equally guilty" language could be misleading if the defendant might be guilty of different crimes and the jurors interpret it to preclude such a finding. (*Bryant, supra,* 60 Cal.4th at p. 433.) That is, while an aider and abettor may be criminally liable for acts not his or her own, the aider and abettor's guilt may be "based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) " '[O]nce it is proved that "the principal has caused an *actus reus*, the liability of each of the secondary parties should be assessed according to his [or her] own *mens rea*." ' " (*Id.* at p. 1118.) If the aider and abettor's mental state is more culpable than the direct perpetrator's, his or her guilt may be greater. (*Id.* at p. 1117.) "[A]n aider and abettor's guilt may also be less than the

---

[26] In April 2010, the Judicial Council amended CALCRIM No. 400 to omit the "equally guilty" language. (*People v. Johnson* (2016) 62 Cal.4th 600, 640.) The final sentence now reads: "A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." (CALCRIM No. 400.)

perpetrator's, if the aider and abettor has a less culpable mental state." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164.)

In *People v. Samaniego, supra*, 172 Cal.App.4th at page 1162, two defendants went to kill the victims, but no eyewitnesses saw the actual shooting, so no evidence established which defendant was the direct perpetrator. *Samaniego*, at page 1165, concluded that CALCRIM No. 400 was misleading as applied to the unique factual circumstances, although it also noted that the "equally guilty" language is "generally correct in all but the most exceptional circumstances."

In *People v. Nero* (2010) 181 Cal.App.4th 504, the theory against the aider and abettor was she handed a knife to the defendant, who used it to kill the victim. The jury asked the trial court if an aider and abettor's guilt could be less than the perpetrator's guilt. The trial court did not respond in the affirmative, as it should have. Instead, it reread the instruction, which included the "equally guilty" language.[27] (*Id.* at p. 518.) The jurors confirmed the instruction answered their question and found both defendants guilty of second degree murder. The Court of Appeal concluded that the trial court improperly instructed the jury with the "equally guilty" language. (*Ibid.*)

Here, as to Cerda, the issue remains relevant only to the convictions we are affirming, counts 15 to 24 regarding the Morning Circle incident. As to those counts, the jury found that Cerda personally used a gun during that incident, i.e., Cerda was the shooter and the actual would-be killer. Therefore, Cerda was

---

[27] The trial court in *People v. Nero, supra*, 181 Cal.App.4th at page 512, instructed the jury with CALJIC No. 3.00, which is the equivalent of CALCRIM No. 400.

50

the direct perpetrator. Under these circumstances and the evidence we have detailed above, the jury would not have found that Cerda had a less culpable mental state than Johnson.

Moreover, our California Supreme Court has found that CALCRIM No. 401, which was given here, resolves any potential confusion caused by CALCRIM No. 400. CALCRIM No. 401 required proof that the aider and abettor must (1) *know* of the perpetrator's unlawful purpose, (2) *intend* to facilitate or assist that unlawful purpose, and (3) *act* in some manner that does assist or facilitate the unlawful purpose. Notwithstanding the "equally guilty" language of CALCRIM No. 400, CALCRIM No. 401 advised that aider and abettor liability must be predicated on the state of mind of the aider and abettor, and the extent to which he knew of and intended to facilitate the purpose contemplated by the perpetrator. (See *People v. Mejia* (2012) 211 Cal.App.4th 586, 625.) CALCRIM No. 401 thus clarified that culpability was not based on the mental state of the direct perpetrator alone.

Accordingly, if the trial court omitted the "equally guilty" language from CALCRIM No. 400, we are convinced beyond a reasonable doubt the jury verdicts would have been the same. (See generally *People v. Johnson*, *supra*, 62 Cal.4th at p. 641.)

VI.    Shooting at an occupied house as a lesser offense

The natural and probable consequences theory was based on the target offense of shooting at an occupied house, in violation of section 246. Cerda contends all the convictions predicated on the natural and probable consequences doctrine must be reversed because the trial court failed to give the jury an opportunity to convict him of shooting at an occupied house as a

51

lesser included offense. To the extent this contention survives, we reject it.

Shooting at an occupied house is not a necessarily included offense of murder or attempted murder. A crime is a necessarily included offense of another crime if all elements of the lesser offense are included in the elements of the greater offense. (*People v. Martinez* (2005) 125 Cal.App.4th 1035, 1042.) In other words, if a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former. (*People v. Montoya* (2004) 33 Cal.4th 1031, 1034.)

The elements of shooting at an occupied house include, as one would expect, that the defendant fired a gun at an occupied house. (§ 246; *People v. Manzo* (2012) 53 Cal.4th 880, 884–885.) The elements of the greater offenses (murder and attempted murder) do not include all elements of the lesser offense because murder and attempted murder do not have to be committed by shooting at a house. Therefore, at most, shooting at an occupied house was merely a lesser related offense. As Cerda acknowledges, a trial court has no sua sponte duty to instruct on lesser related offenses. (*People v. Birks* (1998) 19 Cal.4th 108, 136.)

Cerda, however, invites us to fashion a new rule. He correctly explains that when the prosecutor specifies a target crime under the natural and probable consequences theory and the trial court instructs on its elements, the jury is required to determine whether it has been committed to reach a conviction for the nontarget crime. Cerda appears to assert that the target offense is the functional equivalent of an element of the pleaded crime. He goes one step too far by proposing that as the

functional equivalent of an element of the pleaded crime, the target crime becomes a lesser included offense of the nontarget crime. Cerda claims that as a lesser included offense, the jury should have been permitted to reach a separate verdict on it. We decline to create such a new rule.

VII. Ineffective assistance of counsel

Cerda contends he was denied effective assistance of counsel because trial counsel failed to object to the gang expert's testimony about a so-called "hard card" that indicated Cerda was a gang member. Because the entries on the card had not been made by the testifying expert himself, Cerda contends their admission violated California hearsay law and the federal confrontation clause as established by *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).

A. *Additional facts*

Detective Gillis explained that deputies collect information on suspected gang members by routinely filling out field identification cards, or "F.I." cards, to track their contacts with suspected gang members. This information includes the date and location of the contact, the person's name, birth date, address, description, tattoos, driver's license number, gang name, and associates. An F.I. card is not always completed for every contact with a person. A "hard card" contains a photograph of the person and a compilation of information from F.I. cards.

Detective Gillis spoke to Cerda in the past. But he could not recall if Cerda had ever admitted to him that he was an LMS gang member. The detective had reviewed Cerda's hard card and an F.I. card completed by a deputy named Fender. According to the hard card, Cerda was affiliated with the LMS gang and had

53

admitted membership in March or August of 2008.  Detective Gillis opined that Cerda was an LMS member based on his "consistent association" with LMS members in an area which they were trying to claim as their turf.

B. *Confrontation clause*

Admission of testimonial hearsay against a criminal defendant violates the Sixth Amendment right to confrontation, unless the declarant is unavailable to testify, and the defendant had a previous opportunity to cross-examine him or her. (*Crawford*, *supra*, 541 U.S. at pp. 53–54.)  Confrontation clause jurisprudence, especially regarding expert testimony, has evolved since Cerda's 2011 trial.  Our Supreme Court in *People v. Sanchez* (2016) 63 Cal.4th 665, 670–671 (*Sanchez*), has since considered the extent to which *Crawford* limits an expert witness from relating case-specific hearsay in forming an opinion. "*Sanchez* 'jettisoned' the former 'not-admitted-for-its-truth' rationale underlying the admission of expert basis testimony, and occasioned a 'paradigm shift' in the law." (*People v. Iraheta* (2017) 14 Cal.App.5th 1228, 1246.)

We need not discuss the intricacies of the *Crawford* evolution.  At the time of trial in 2011, objecting to Detective Gillis's testimony about the notations on Cerda's hard card would have been routinely and properly overruled by the trial court.  At the time, the well-established rule in California was that reliable hearsay evidence was admissible under Evidence Code sections 801 and 802 for the non-hearsay purpose of revealing the basis for an expert witness's opinion and, in that context, such evidence was not admitted for its truth.  (See generally *People v. Gardeley* (1996) 14 Cal.4th 605, 617–618, disapproved by *Sanchez*, *supra*, 63 Cal.4th at p. 686, fn. 13 [expert testimony may be premised on

material not admitted into evidence if "it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions" and the expert "can, when testifying, describe the material that forms the basis of the opinion."].)

Cerda's defense counsel could not have been reasonably expected to anticipate the subsequent change in law wrought by *Sanchez*. Defense counsel cannot be faulted "when the pertinent law later changed so unforeseeably that it is unreasonable to expect trial counsel to have anticipated the change." (*People v. Turner* (1990) 50 Cal.3d 668, 703.) At the time of Cerda's trial, it was not reasonably foreseeable that caselaw would conclude the hearsay upon which the gang expert relied was offered for its truth, and the admission of such hearsay violated the confrontation clause. Accordingly, we conclude Cerda has failed to show that defense counsel's performance was deficient. (See generally *Strickland v. Washington* (1984) 466 U.S. 668, 687–688; *People v. Mickel* (2016) 2 Cal.5th 181, 198 [ineffective assistance of counsel requires showing (1) counsel's deficient performance and (2) prejudice].)

## DISPOSITION

The judgment is reversed as to Johnson as to all counts and as to Cerda as to counts 1 through 14 with the direction to the trial court to give the People the opportunity to retry them. The true findings on the gang allegations are reversed as to all counts as to both Johnson and Cerda with the direction to give the People the opportunity to retry the gang allegations. In the event the People elect not to retry Cerda, then the trial court shall resentence him.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.

56